LLC and 108 N. State Transit LLC. Good morning, Your Honor. Douglas Reese for Appellant 108 N. State Retail LLC and 108 N. State Transit LLC. Eppley. Good morning, Your Honor. John Anderson for the plaintiff, Eppley, Bank of America, N.A. Very good. I can assure you what's happened is that Justice John Steele is out of town, so he's not here, but he will be listening to the oral arguments when he returns later this week. I can assure you that we've read the brief, so we're familiar with it. Hopefully you looked at Centerpoint. I don't know if it's this close. It's different on its facts than this, but it's a new case in this area. I thought it was more significant before I read your briefs, frankly. Your briefs are much better than the ones in Centerpoint on both sides. So not to knock anybody here if you're from Centerpoint, but that's true. But we normally give you 15 minutes to sign, but whatever you need. We don't look at our watches. That's a huge case. So whenever you're ready, Mr. Reese. May it please the Court. As the Court knows, this is an appeal of the Circuit Court's order appointing a receiver to take over possession and control of the multilevel retail mall and Pedway project known as Block 37, which I think we can see from this courtroom. Last week, as Justice Quinn mentioned, this Court issued the Centerpoint opinion and asked the parties to be prepared to discuss it. And I am prepared to discuss that case. And to point out that there are several ways that this case is different from not only Centerpoint, but all of the other cases that the Bank cites in its papers and, in fact, the other reported foreclosure cases that we've seen. Unlike Centerpoint, Mellon Bank, Home Life, Travelers, the key cases, unlike those cases, in this case, there was no payment default. In every one of those cases, there was a substantial admitted and proven payment default. And as the Court held in Mellon Bank and then as this Court followed and held in Centerpoint, a proven default, I'm quoting, a proven default establishes a reasonable probability of success under 17.1b.2 of the Mortgage Foreclosure Law. And so, as you know, there are two tests for the appointment of a receiver. The first test is the bank has the burden to show that it has a reasonable probability of success on its underlying foreclosure action. If it succeeds and meets that test, then the burden shifts to the borrower to show good cause not to appoint the receiver. And we're not in any way suggesting to change that law, but as you read the cases, almost all of the cases, including Centerpoint, focus on the second element, the lack of good cause or the question of good cause. And that's because in all of those cases, there's really no question that the first element was met, that the bank established a reasonable probability by showing a payment default. In this case, there was no payment default. All the interest had been paid on the loan. The principal was not yet due. At the time the bank brought its foreclosure action, there were still millions of dollars available under the construction law. Excuse me, counsel, is the requirement that there be a payment default or just that there be a default? There needs to be an actionable event of default. And it is fact, though, in all of those cases, it was a payment default. And we have asserted that the defaults in this particular case, what I call small d defaults, are not actionable events of defaults for a few reasons. The main default that the bank seized on is a so-called loan imbalance. And the construction loan in this case required is a condition that the loan would have to remain in balance. And what that means is that the amount budgeted had to be sufficient, had to be within the scope of the amount that was available under the loan. And so if at some point the budget for the project exceeded the amount of the loan, then the loan would be out of balance. Our clients took over this project in 2007. As you probably know, and certainly as described in our briefs, there had been previous developers. The most recent had been the Mills Corporation. And at that point, the project was stagnating. The Freed Organization formed the two entities that are the appellants here to take over the project. They eventually invested $20 million of their own money, as well as their time and reputation, to get this project substantially completed. In the earliest stages in 2007, our clients took over the project, and they examined the work, and they examined the budget, and they noted that to complete the project consistent with the city redevelopment agreement, a development agreement that not only our clients were obligated to adhere to, but the bank also was obligated to adhere to, to get that work done consistent with the redevelopment agreement, it would have taken $26 million additional dollars at that point. So as early as 2007, our clients informed the bank that additional funds would be needed. And at that point, the loan was technically out of balance. Despite that out-of-balance condition, the bank continued to approve work, continued to approve change orders, in fact, continued to fund, and in fact, really almost as a partner with the developers, added to the loan imbalance to get this work done. Is that good? Right? For the brief, you can actually take it that you're complaining about this, as some of the bank led your clients down a spring rose path when they were supplying tens of millions of their own dollars into this as well. Well, I don't know that those are really their own dollars, because those are dollars that ultimately our clients would be obligated to repay. But it is good that they were supporting the project. But for the bank to support the project and knowingly go along with the program, including the out-of-balance work, later to pull the plug, using that as a condition, calls into question the legitimacy of that particular default. But what were their choices? Let's go back in time. And so now it's out of balance. It eventually gets to be over $42 million out of balance.  At that point, the bank would have a choice of demanding to get back into balance within 90 days, or you default, your client would default, or do what they did, which is to talk to your client, come to an agreement that they'll wait, the whole thing is in abeyance, and they'll still pump money into this, and proceed in the hope on both sides that this will work out. Right? Yes. And they chose not to do the first one, which is to say, you know, we can't trust you anymore, it's just too dangerous, give us the 20 mil in 90 days and we'll shut you down. Yes. So they did the right, what I would suggest is the right thing, trying to help. And only some, go ahead. Yes, they did at that point. And, in fact, as your Honor points out, what they did not do is the former. They did not, at any stage within that two-and-a-half-year period, actually request that our client make the balancing deposit to put the loan back into balance. And the reason they did not do that, there's a real reason, and it's alleged in our verified pleadings that the bank never denied, and that is because the parties were negotiating a loan modification that, if ultimately approved, and it never was, but if that loan modification had been signed, it would have put the loan back in balance. Those negotiations continued. They were serious. We allege in our pleadings that at one point there was a meeting with the city, there were representations made after that meeting by the bank promising to get this done. Those discussions continued, and they continued up until really just shortly before the bank filed its complaint. And, Justice Quinn, I'd like to focus on the question that you asked about the need for the bank to make a request. And that's a fundamental distinguishing factor in our case and an important point that the circuit court never addressed. And that is, before you get to our affirmative defenses, which is an important part of our case, there's a fundamental failure of proof in the bank's own affirmative case, and that is that to establish an actionable event of default under the loan agreement, the bank was required to make a formal request for our client to make a balancing deposit, and they also were required to give our client 90 days to cure that condition. It's not enough, as the bank argues in its briefs, that we were on notice. There's no dispute here that the parties were on notice from the beginning that there was a not of balance condition. But a key element that was a negotiated term of the loan agreement was that it wasn't noticed that the bank had to make a request. And I refer the court specifically to two provisions. The first is 7.4D of the loan agreement, which is record page C350, which requires that the bank, if there is an out of balance condition, the bank can make a request to the developers to make a cash deposit. But then they reply, as they did in the trial court, with the 23 letters of agreement signed by very sophisticated people on your end, saying where they agreed that they would waive all their defenses. They agreed at the very end, the last one in August, where they said we agreed that this would amount to a default if the bank were to push it. If the bank were to ask for this default, we concede it's a default, and we waive any and all defenses. Again, in the hope that the bank will continue to cooperate. And then there are three cases cited by the parties, by the bank, citing that BA mortgage, Colson federal cases, and then Faluning, or however you pronounce that word, that you can actually do that, that you can waive defenses. And Illinois historically looks at waiver defenses as being things that you can do. For sophisticated, you can waive your defenses. And that's what these letters of agreement say. You can waive defenses, and I will address why we didn't waive the defense in this particular case. But there are a couple of other responses first, and that is, first of all, the letter agreements, while they do use the language event of default, at no time do the letter agreements ever include the language that the borrower was waiving the request period. It makes a cross-reference to the default under the loan agreement, and the loan agreement specifically requires the 90-day period. But how are you helped? I understand that in legal terms, we were never in default because they never asked us to pay them back. As they point out in their brief, at the time the briefs were filed, or when this ended in the circuit court, $42.6 million was owed. There's no hope your clients would come up with $42.6 million. If they would have, I'm sure they would have. But so how are you, I don't know how that age group, how is your client helped by them doing what they agreed not to do when they received the letters? Why are you helped by them saying, all right, you're in default, you've got 90 days, or we'll fine you in default. Give us the money. How are you helped by that? I disagree that there's no hope, and there's a big way that we would be helped. And that is, at the time, and that's why there's a difference between notice and request. At the time when the parties signed these letters, they knew that the parties were actively negotiating a loan modification that would remove the need to go get funds elsewhere. And that's a key difference here because the parties continue to negotiate that loan modification. So when the bank presented to our clients, really the Hobson's choice to say, either sign these letters or else the project shuts down. Our clients signed the letters knowing that nothing in the letter agreements altered or modified the obligation in the loan agreement. And what would have happened if we were kind of going back in time to determine what would have happened had the bank provided the actual request, that would have triggered, allowed our clients to know that no longer could they rely on the bank and their promises for a loan modification. No longer could they hope that there would be an agreement to put the loan back in balance. But at that point, they would have to go out and find other investors and find other sources of capital to make that balancing deposit. And here, the bank jumped the gun. I mean, just common sense would tell you, anybody who's at all sophisticated, and I certainly am not in this area, is that my bank is telling me either sign this letter of agreement saying you're in default or I won't give you any more money because you're out of balance. Well, then I know the bank's not playing. If I feel put out by this, I can go to another bank and say, you know what, I need another $100 million to finish this project. Block 37 has been there for 30 years. Give me $100 million, will you? And common sense would tell you to go out and get other funds if the bank wasn't at the same time giving you a term sheet with a loan modification that would put the bank back in balance. What was the timing of the negotiations on the loan modification? The loan modification negotiations continued for a period of time. Before the later half of 2008, we allege that by December 2008, they actually rose to the level of exchanging a term sheet. So it wasn't just a pious hope. There were actual discussions about terms of a loan modification into 2008, and those discussions continued into 2009, even up to shortly a week or two before the bank filed its complaint. The parties were continuing to try to close and finalize that loan modification. And that's the key point here. Before you go to the key point, though, in the letters of agreement, there's the clause which constantly talks about, oh, there may be conversations or maybe loan modification negotiations going on, but that really doesn't count for much. That's true, Your Honor, and actually I would say that that really benefits us because we are not here, and one of the arguments the bank had raised is whether somehow one of our claims is barred by the Illinois Credits Agreements Act. We've never brought a claim based on their promise or claiming that the court should hold them to the promise for the loan modification. We presented the evidence of the loan modification to, again, to describe and put in context why this was not material and why it was reasonable for us and the circumstances to rely on those negotiations and not go out and try to get other funds. The other thing directly in response to your question, Justice Coleman, is that when you look at the letter agreement, and I have one, I think it's the last one that happens to be record page C-686. It's the August 25, 2009 letter agreement, and at the back page, before you get to the language that the bank points to, which is the waiver of defenses, there's important language above that in the paragraph above that says that unless and only to the extent contained in a definitive written agreement for modification of the loan, nothing in this agreement in subparagraph 3-III shall constitute a modification or amendment of any loan document. And so you have this problem of a conflict where you have this letter that the bank is foisting on the developers to say you have to sign this letter or we're not going to fund any more money. And it uses language of an event of default, but it has a cross-reference to the loan agreement and it says it's not in any way modifying the terms of the loan agreement. And section 11.1K of the loan agreement, record C-389, makes clear, I'm sorry, I cite the wrong page, page C-375, again, has the specific bargain floor provision that says that when it describes events of default under the loan agreement, it notes that a failure by depositors to deposit with the agent funds required to maintain the loans in balance. But then it says, except that in the case of a deposit required by section 7.4D, such failure shall not constitute an event of default unless it is continued for a period of 90 days after the date of request by agent for such deposit. The fact is here, there's nothing in the record where the bank made that request. It's not alleged in the complaint and it's not in the letter agreement. But going back to the issue of receivership, which is all we have in front of us, is whether or not the bank is likely to prevail. And they cite, the bank cites in their response to your economic duress or whatever you want to call your defense in this area, it's a compulsion. Heard versus the Wildman Herald where it cannot be predicated upon a demand that is lawful or upon doing or threatening to do that which a party has a legal right to do. And frankly, financial pressures does not constitute duress. And that's why we, are they likely to win? Not will they actually win because you can still proceed, obviously. So the receiver, let's assume we affirm the appointment of receivership, you'll still be in court. You'll still be arguing in front of the trial court. But they're not going to succeed. They never asked. They never filed their demand for 90 days, give us 90 days to get money. And you may prevail and then the receiver will be removed. They have to show just likelihood right now. That's true. A reasonable probability. Right. And there are two reasons why the letter agreements aren't enforceable. First is the duress point. And we understand that the case is strict on duress. Although one of the key cases that we cite is the Herget case, if I'm pronouncing it correctly, Herget National Bank v. Thiede, 181 Illap 3rd, 1053. And in that case, there's some similarities here. It's where a sophisticated businessman found himself in financial straits. There was something involved with his wife engaging in some financing, and he went to draw on a note and the bank rejected and wouldn't fund his request. And the bank told him that the only way they would provide him the money is if he signed a new promissory note and represented him that he needed to do that. And they told him that they would honor the check, but only if he signed the new consolidated note. That's not dissimilar here. I mean, here we acknowledge that our client was a sophisticated entity. But this is a unique circumstance and a unique economic time where we think that this crosses the line where, at one point, at some level, any party in a commercial transaction has economic leverage. But is it unique to this going back? As you know much better than I, that the mortgage industry, it's been a disaster for several years now, especially even more so in commercial than homes. We see it all the time, frankly, in condo conversions and counseling. They understand it's residential property. So we have lots of receivers being appointed in this area, and that's what's done. To move the project along, the idea of the receivership being they're going to help both parties. Now, I wouldn't necessarily believe that. If I was the developer, I'd rather be the manager. But we have a lot of these cases, frankly. I don't know. Well, we do. And we understand that the courts are reluctant to allow borrowers to just reach for the duress defense and get out of their obligations. But the law of economic duress is read this way, at least in the Herget case, where the party is induced to act by some wrongful act of the other, taking advantage of the business or financial stress or extreme necessities or weakness of the other. We've submitted the wrongful act here, and it's alleged in the verified answer and affirmative defenses, again, that the bank never denied. But they did file a motion to strike, which was granted. They did. But when they file a motion to strike, the court was required to treat those allegations as true. And so this is a situation where the presumption that's available under the Illinois Mortgage Foreclosure Law runs dead up against the Illinois Code of Civil Procedure. And, again, in the cases that we've signed and found, we haven't found a situation like this, where the borrower not only alleges affirmative, verified affirmative defenses and facts, but the bank doesn't reply to those or deny them. In this case, the bank did choose to move to strike them. There's another reason, though, besides economic duress, why the letter agreements can't bar or can't allow the bank to prevail or establish a reasonable probability of success. And that is because there's no way in fact or law that those letter agreements could bar defenses that didn't exist at the time those letters were signed. And we've identified at least two defenses that did not exist at the time the letters were signed. One is the Latches defense, and the other is the Covenant of Good Faith and Fair Dealing. And the breach of the Covenant of Good Faith and Fair Dealing in this case is significant, and really for two reasons. One is because under the law, a party cannot waive the Covenant of Good Faith and Fair Dealing unless done so explicitly, expressly. And we cite those cases in our briefs, including Foster Enterprises and the UCC. The Covenant of Good Faith and Fair Dealing is such an important element that it can't be waived unless done so explicitly, expressly. In this case, I think one versus Rossetti, though, written by Justice Garland, who's done rather well since he wrote that, about going the other way. And that's the Illinois Appellate Court case written by one of our Supreme Court judges rather than a federal district court judge. But there are two points there. One is it has to be waived expressly. Here, there's nothing in the letter agreements to make any mention at all to the Covenant of Good Faith and Fair Dealing. And perhaps more importantly, at the time the letter agreements were signed, the conduct giving rise to the Covenant of Good Faith and Fair Dealing hadn't yet occurred. That was relatively late in the project involving the fourth-floor tenant, Movico. And you can't understate the importance of that particular tenant to this project. It's a major tenant that takes up many square feet on the fourth floor. It was a tenant that our clients found early on in the project. In fact, one of the exhibits that's attached that's in the record is, again, in that early meeting in 2007 when our clients noted the additional funds that would be needed. One of the things that had happened is the original tenant up there, the bowling alley, had pulled out. And so under the redevelopment agreement, we were required to find unique tenants. And the movie theater was one that qualified as a unique tenant. That was presented to the bank. The bank approved that concept and approved work to do the infrastructure work for the theater. So if you go over there now, while the work has stopped on the fourth floor, much of the infrastructure is done. Well, part of the problem there, too, was that one of the developers had actually taken a personal interest in that, or at least that was the allegation. And then when he divested himself of that, the rents went down. I would argue that's a post hoc rationalization. That was not alleged by the bank, certainly not in the complaint. And in fact, though, that actually supports the finding of bad faith here because there are other leases over at that project where the developers, because of the nature of this project, have a fully disclosed interest, where they would joint venture, for example, with Bigsby and Crothers or with Let Us Entertain You, where the developer would partner with those particular developers, with those particular tenants, to get them into the project. The bank, all of that was fully disclosed to the bank. And in fact, we allege in our affirmative defenses that the fact that the bank approved those transactions is evidence that they exercised bad faith here because they seized on that excuse as the reason to pull the plug on this particular lease, even though they had approved other leases that had those kinds of arrangements. But I understand just the nature of the case, as you say. So you're alleging bad faith and economic duress, both of which are very, very tough to prove. And again, the standard is reasonable probability. We will still have that battle to be fought down below, but was the trial court wrong to hold that there's a reasonable probability that the bank is going to prevail? Where the defenses are economic duress and bad faith on a bank that poured, I don't know, certainly over $100 million in the project so far. That's a tough road to hoe. I understand that it's a tough road to hoe, no doubt about it. And I do think that this court would be able to craft a narrow opinion that is really limited to the particular facts in this case. I suppose we would make it a Rule 23. I'm sorry. That would be possible. And in fact, Your Honor, again, there are facts that are unique to this case. But why we believe that the circuit court erred is because the court based its entire opinion on those letter agreements, not taking into account whether the bank actually honored the agreement by giving the request. That's before you even get to the letter agreement. So the circuit court didn't address that question. It can be addressed by this court as a matter of law. And second, the court, again, rejected, felt that the letter agreements applied to any defense under the sun, even if the defense didn't exist at the time the letter agreements were written. And so if there's ever a case where a party could show that the bank didn't establish a reasonable probability, it would be this one. There is an interesting question that this court really addressed more directly in the center point case. We didn't explicitly raise it, which is, though going to your point, Justice Quinn, which is, what does the court need to do? Does there need to be an evidentiary hearing? We have not asked for or demanded an evidentiary hearing in this case and don't think that the court needs to require one, certainly in every foreclosure case. I don't think it would be inappropriate. In fact, I sort of compare this to a TRO, preliminary injunction situation. If a party comes in and asks for a TRO on the basis of a verified pleading, the court would decide whether there's irreparable harm, whether to grant the TRO. But once the defendant submits verified pleadings that call into question those facts, then usually there is an evidentiary hearing before a preliminary injunction can be entered. So this case is more like the latter situation because we have alleged verified pleadings that call into question. And wouldn't that, honestly, it will be appropriate when the battle is joined down below on the whole idea of whether you're in default or not. It might well call for that because certainly bad faith is more than economic duress. That is something that's susceptible, I think, to evidence. You have to show it. You should be allowed to show it if you can. Here, again, what we have in front is the receivership. It's done usually like that. It is. But even before you get there, at minimum, the circuit court should have, and this court either can or could remand it to the circuit court to do it, the court should have considered the strength and legitimacy of those defenses, particularly in light of the state of the pleadings in this case. Again, one of the main differences is the fact that the borrowers in this case alleged specific verified and facts that were undenied, that the bank chose not to deny. So at that point, the court was required to accept those allegations as true. Ultimately, we'll have a fight over whether we prevail, but the question that really is facing this court and facing the circuit court is would those defenses have proved to feed the bank's case and to feed the reasonable probability? And again, the standard that this court held in Centerpoint and in Mellon Bank before was that the reasonable probability test is made, is satisfied, if there is a proven default. And, Your Honors, we've argued why we think in this case it's far from a proven default, and in fact, the defenses that we've raised would defeat the bank's case. Your Honor, I'm mindful and I appreciate that you've given us time, but I'll move on to the question of good cause. If you could. Again, it is important, and I do think that this case that you have before you today could be a good companion case to the Centerpoint case, because Centerpoint only focused on good cause, as well as most of the other cases that have been issued in this space relate to good cause. And that is because there aren't many cases where there are facts like these where there's a reasonable argument to fight the reasonable probability test. But we also challenged good cause and presented evidence, including affidavits, showing that in this particular case, the bank's chosen receiver, that there was good cause not to appoint the chosen receiver. And, Your Honor, if I may, I think there's an opportunity here to either go further than Centerpoint or maybe clarify some of the rules in Centerpoint. As the Court struggled in Centerpoint, I don't know if the Court struggled, but certainly the parties struggled with the fact that many of the cases were in the negative, that there were cases that showed circumstances where there wasn't good cause, but there's not a lot of guidance about what is good cause. And as we read through Centerpoint and the other cases, we believe that what emerges is a multi-factor test, and that there is guidance for the courts, for the circuit court, certainly we're not advocating in any way to shift the burden to the bank. We understand that the borrower in every case has the burden to show good cause. But there are multiple ways we'd submit that a borrower could show good cause and why the borrower in this case did show good cause. One factor is the factor that the Court pointed to in Centerpoint that wasn't established in Centerpoint, which is, does the appointment of the receiver interfere with the commitment for financing from other lenders? Now, in this case, Your Honor, limited as I am to the record before me, I can't address the details with respect to that point other than to say that in this particular case, because the bank acted prematurely, because the bank brought the foreclosure action before giving the 90-day period, you had raised some skepticism about the chances to get that money. I'd submit that actually had the bank provided the official notice, then and if it were to do so now, start the clock running, then our client would know that it can no longer rely on the bank and would need to get additional funds. Your client doesn't know now he can't rely on the bank? It certainly does know now. I would hope so. And has been taking steps in that regard that the bank is familiar with. But... Well, one of the points you made in Centerpoint, and I don't know if it's because you're catching your breath, I guess, is that one of the things we said would be a good cause, and we're just making this up, you know, guessing, because we're not realty people, real estate investors or bankers, would be if somebody's ready to buy it, you had another financial, somebody willing to finance you, waiting in the wings, you know, so why would we let the bank go in then and hurt that, damage that prospect? I don't get the impression there's any such thing here. Again, there are lots of cases which both sides talk about, especially the bank, and where the lender has rejected tenants, and that's a problem, which we have here, I think, one of the allegations. Go ahead. I want to be careful, Your Honor, because I want to limit my conversations to what's in the record. Certainly at the time that we were arguing below, there was not the kind of commitment to buy the loan or to buy the project at that time. But I agree that as the court articulated in Centerpoint, that that is a factor the court should consider, and that's a strong factor that that would be good cause, and that might be enough in a particular case to be good cause in and of itself. Here, if there's not that evidence of a formal commitment or a full commitment that the court required in Centerpoint, there are additional factors that we think taken together could amount to good cause. Maybe one of them by itself would not be sufficient. For example, one of the other points that this court dealt with in Centerpoint, and also the court addressed in the asset guarantee case that we cite, is there evidence? Again, not does the bank rebut it, but does the borrower submit evidence showing that the borrower, the owner, is better able to manage or operate the project than the receiver? Centerpoint pointed out, the court, Your Honor pointed out, that that's not a presumption, but it could be a relevant factor, and in fact, in Centerpoint, that evidence was lacking. Here, there's substantial evidence. It's a different, very different case from Centerpoint, where you have a thriving project that our clients have been managing, and there are affidavits in the record showing that they had over 20 full-time people there managing the project. So I understand and agree. And the receiver pointed has conflicts of interest, which are apparent, and was unable to get insurance, but they blame you for that, or your client, I should say. Yeah, so there are problems with that. Well, and in fact, you're stealing my thunder, Your Honor, because those are additional factors that should be considered. The conflicts of interest, obviously, you know, we believe that those were taken too lightly by the bank, and taken too lightly by the receiver, and not really fully considered by the circuit court. We cite the circuit court. Wouldn't you have that problem, though, with every – if you're a bank, you have to go get an outside person to act as a manager for property, hopefully somebody familiar with the area. Wouldn't almost anybody they get have a conflict, because wouldn't they already manage properties that would be in competition with 37? Well, here it's a different particular kind of conflict, in that C.B. Richard Ellis, the firm that employs the receiver, is one of the largest tenant brokers in the country. And so in this particular situation, they want to wear two hats. And, in fact, they continue to want to wear two hats in lease negotiations to represent both the landlord and the tenant. And they've not resolved that conflict. And that's a conflict that doesn't need to exist. There are certainly plenty of receivers that don't have that particular conflict, and there are also mechanisms that they could have employed to eliminate that conflict, but they didn't, and they haven't. So that's a major factor, and there's really strong and unrebutted evidence that those conflicts exist. Again, the bank's response is those are common in the real estate industry, and our response to that is they may be common in the real estate industry, but they're not common for receivers who are court-appointed officers of the court. Second, another factor, Your Honor, is this is a case, obviously, C.B. Richard Ellis is a big, sophisticated company. But all the more shocking why, in this case, they demonstrated on their own a complete lack of fundamental knowledge and preparation to take over the project. Before even getting to the insurance problem, the receiver submitted to the circuit court a management report that would treat this project as a office building. And there are several examples that we cite in our brief that I won't go into. Security, health club, things that can't be done in a ped way. Exactly. Also, the lack of preparation, again, is a significant factor. When we were arguing before the circuit court, objecting to the appointment of the receiver, the hearing on the 20th of November, we argued strongly that one of the things that the receiver would need to be prepared to produce is insurance, not just the usual property and casualty insurance, but because this is an ongoing construction project, and even though it's substantially complete, there's still a fair amount of construction going on with contractors and subcontractors on the job. We noted that they needed to obtain what's called owner-controlled insurance program that would provide coverage for those workers. The receiver either was arrogant or ignorant, because the receiver said, we'll have our insurance within a day or within days. And it didn't happen. At that time, our client, we offered to provide an assignment of our existing policy to the receiver, sent all the documents to the receiver's counsel, and it didn't happen. And that story, again, it's detailed in the brief, but it went on for nine weeks. Ultimately, after going back and forth to deciding either to get their own or to be added as an additional insured, they finally decided to go the assignment route that we had proposed nine weeks earlier, and it was finally done. Now, again, we understand that it's a complicated issue, but the bank filed its foreclosure action back in October. They asked for the appointment of the receiver back in October. They identified this particular receiver back in October. Certainly a sophisticated bank and a sophisticated receiver knew or should have known that this kind of insurance needed to be in hand, and they didn't have it done. So as a result, again, evidence of who's really best to run the project, our client ran the project for those nine weeks. At the time when the project was opening over the holiday season, both at the busiest time of the year and, you know, without any detriment certainly to the bank. We should wrap it up. We just have time for reply. I guess the last thing that I would say is one more factor on good cause is that is there evidence of actual harm to the project? And, again, this court knows that in receiverships there are always fees, but we've also pointed out here that there are problematic fees because there's double and even potential triple counting where the receiver is not only charging for her time but then on top charging an additional management fee by her firm, and they propose to pass those on to the tenants even though the tenants are already paying an administrative fee. Again, that goes not only to lack of knowledge but also harm to the project. So, Your Honor, in light of really both tests, the failure of the bank to show a reasonable probability because of the defaults are really material, actionable events of default, plus the factors showing good cause we believe should cause this court to reverse the order appointing the receiver. Thank you, and you'll have time for reply. Thank you. Mr. Anderson. May it please the Court, John Anderson for the Appellee Bank of America. Your Honor, the appellant has made several points I'd like to address. Their first point was that there was no proven default here, and they're referring to a monetary default. I think we covered that at length in our brief. The loan was originally made in March 2007. In the fall of 2007, there were indications from the borrower, and this is page 7 and 9 of their brief, that the loan was not going to be sufficient to complete construction. On December 13th, 2007, the borrower informed the bank that it was going to cost an extra $26 million over the proceeds adequate for the completion of the project. The loan agreement had attached to it as Exhibit E a project budget, which showed the project to be fully in balance, namely, with the loan and with the equity investment by the borrower, there would be sufficient funds to meet the construction expense. The borrower specifically represented in Sections 2.1M and V of the loan agreement that he had investigated all the construction costs and that they were accurately shown on his project budget. But within nine months of the loan being made, he was coming to the bank saying, well, it's going to be $26 million more. I'm sorry. Why did the bank take so long? Well, that's what I'm going to go through right now, the whole sequence to cover what happened here. We're right in December, and it's first disclosed that it's $26 million over. And was that free? That was $26 million over? Yes. In other words, it was going to cost $26 million more than the funds that were shown on Exhibit E to the loan agreement, which is the loan of $173 million, his equity contribution, and several other payments back and forth involving the CTA parcels. But it was going to be $26 more than the anticipated cost by December. The parties talked, and as attached to this appendix, speed art brief, on March 28, 2008, the bank sent the borrowers a letter, and it says that the loan is now out of balance because they've just been told it's going to cost $26 million more. And it says, these default would constitute events of default if not cured within the time period set forth in Section 11.1K of the loan agreement. Under Section 7.4D of the loan agreement, which is Appendix C to our brief, borrowers agree that if for any reason the loans are not in balance, borrowers, within 10 days after request by agent, will deposit with agent cash in an amount which will place the loans in balance. So on March 28, they're specifically notified. Under the loan agreement, they have a specific duty to deposit with the bank the amount needed to bring the loans back into balance. That's the $26 million. Also in Appendix C to our brief, under Section 11.1K of the loan agreement, it states failure by the borrowers to deposit with agent funds required to within the time and the manner described in Section 7.4 of this agreement, except that in the case of a deposit required by Section 7.4D, such failure should not constitute an event of default unless it has been continued for a period of 90 days after the date of request by agent for such deposit. So it's first disclosed in December 07. The bank makes a formal request in March 08. Under Section 11.1K, it triggers a 90-day cure period for the borrower to get the loan back into balance. And he has a specific obligation under 7.4D to actually make a payment to the bank of the money needed to bring the loan back into balance. And then under Appendix D to our brief, by August 28, 2008, the borrowers admit that circumstances exist which constitute capital E events of capital D default, including the loan is out of balance by $26 million. That's Appendix D to our brief. Now, the significance of an event of default is under 12.1K of the loan agreement, excuse me, 12.1 loan agreement, which is Appendix E to our brief. At that point, the bank can come in, complete lease construction, file suit, and do everything that's necessary to finish the project in place of the borrower. Counsel, I appreciate what you're saying of all the documents and you're reading this and there's these issues with what the borrower is saying or bringing to you. But at the same time, your history with this project, when your head is brought out of the papers, you're saying that finally a project that's basically had been fraught with all kinds of problems is finally actually moving forward, we're getting to seeing the end of the tunnel, aren't we? Well, it's out of balance. And there's somebody who's going to have to pay the $26 million at the end of December. We file the loan agreement, give the proper notice in March. Within the 90 days, it's not cured. But that $26 million obligation, somebody's going to have to pay that. It's still out there. What happens between August 2008 when they acknowledge that they haven't made the payment? What happens is the parties start, as they plead in their papers, to negotiate a loan modification. We didn't go, you know, snap, you're out of balance, we're going to foreclose right away. The parties try, as they should as businessmen, to work out a resolution. They tried through the balance of 2008 and into 2009. What was happening as they were talking? The situation was getting worse. The $26 became $30. The $30 became $34. By July 2009, it became $42.6 million. So you start working with somebody on a problem that's $26 million, more than their investment, and within several months, eight or nine months, it's ballooned to $42.6 million. Excuse me, but, Counselor, you're still, and the court appreciates this, but when we're talking about a receivership at this time and whether or not a receiver should be appointed, this court is also looking at the fact that, you know, the costs you're saying are ballooning, but also isn't the project getting done? Isn't the project finally reaching some type of? Well, the project is getting done because there was a problem with the contractor. The contractors aren't oblivious to what's going on here. They know that this developer is having money problems. And the contractor walked. And there was a letter of agreement by which the bank, at the borrower's request, agreed to pay the contractor directly to keep that contractor on the job. But as all this was going on, there were issues starting in the spring of 2009 with the leases as well. MovieCo backed out of a lease the bank had approved. What happened? The borrower came to us with a new proposal for a theater, and it's one in which the borrower had an interest. But there were two other hooks. One, this new lease in which the borrower had an interest, the rent was going to be reduced by 37%, and the cost of the tenant build-out for the space went from $5 million to $7.9 million. More was going on. The food court restaurant, the build-out cost was going from $3 million to $15 million. Another tenant, Bigsby and Carothers, in which the borrower also had an interest, its build-out expense went from $584,000 to $2.6 million. So you're having not only self-dealing in the sense of being a tenant, it's an increasing building pattern of self-dealing with these ballooning build-out expenses for these tenants in which the borrower had an interest. And it's the culmination of all that that led to August 2009 when the last letter of agreement was signed, and the borrower still needed to fund the project. So it came to the bank and requested funding for the project, but it wanted to attach another hook again. This time it wanted to have a carve-out for its claims against the lenders on approval of this new movie co-lease with the reduction of rent and increased build-out. And that's what led to the filing of the suit. That's what led to the filing. Well, that and the combination of everything that had been happening over the prior two years. You have a developer who's proving his incompetence. Twenty-six becomes 30, 30 becomes 34, 34 becomes 42.6. You lose confidence, especially when you're confronted with leases that show an increasing pattern of self-dealing, leases which show an increasing pattern of huge cost overruns. You know, what's happened here is these numbers, we throw them around, 26 million, 42 million. But somebody's going to have to pay that to finish the project so that it has some value at the end. So the point is there is still going to have to be more money paid to finish this. You're just saying, why should we leave them in charge? Right. If you're going to have to put up this 42.6 million to finish the project, that's 42.6 million above the total amount of the loan. And you've lost confidence in the developer for the reasons I've gone through. That's why a receiver needs to be in there. You know, a point was made about the cost of the receiver. The numbers are $50,000. It's peanuts compared to what's involved here in this cost overrun. And it was an accelerated cost overrun. A receiver is the only logical conclusion here. But that, I think, addresses the idea that there was no default here. There was a massive default. And to this day, right now we're in 2010. This was first disclosed in December 2007. There's never been one iota of any evidence or any promise or commitment or plan by the borrower to make that good. I think this case is probably a textbook example of a proven default, showing a reasonable likelihood of success. You have the 23 signed acknowledgments, as the Court has said, by a sophisticated party, acknowledging the default. Well, why did you file a motion to strike, assuming it was your firm, as opposed to going ahead and having a hearing on it? Filing an answer, I should say. Because we felt that the defenses, which are basically summarized by Mr. Reese as this post-August 25th, a series of events with the movie co-theater, or failure to approve, really were allegations that there should be a loan modification. And I think if you look at their counterclaim, beginning with paragraph 11, excuse me, Your Honor, paragraph 11, Freed made another detailed request for more funding in August 2008, and the bank continued to indicate that a loan modification was in process. Paragraph 13, thereafter, referring to October 2008, the bank and Freed discussed terms for a loan modification. Paragraph 15, at some point in time in early 2009, with its purported promises to modify the construction loan. Paragraph 17, while Freed signed, referring to letter agreements, each and every one of the letters presented by the bank and attached to the complaint in reliance on the bank promises regarding loan modification. Paragraph 23, Freed agreed to meet with, to work out an agreement on the loan modification of the movie co-deal. The whole counterclaim is really a counterclaim for a loan modification. And we moved to strike that counterclaim for two reasons. One, the letter agreements say that there would be no loan modification until signed and in writing, which is basically the same as the Illinois Credit Agreements Act. Namely, there is no loan modification that we could be held to a breach where there is no signed writing. It's been established law in Illinois for almost 20 years since the Credit Agreement Act was first passed. And we felt that we should not have to answer a affirmative defense or counterclaim where it's barred by the Credit Agreement Act and the party's own agreements, the letter agreements themselves, basically following the statutory structure of the Credit Agreement Act. I would also cite the court to the case of teacher's annuity, 295-113-61. It's a second district case of 1998. In that case, the court specifically addressed the question that has been raised by their affirmative defenses, namely, could an affirmative defense or counterclaim be asserted over promises to have a loan modification? And citing the Credit Agreements Act, the court stated no, even if it involved other allegations of good faith and fair dealing. Because like here, those allegations regarding good faith and fair dealing were, to use the court's words, inextricably linked to the alleged agreement to make a loan. Could you address the standard of review? While in Mellon just last week I wrote that it's de novo, both side-side cases, especially the bank, that it really should be an abuse of discretion. Well, I think there's a little bit of history involved here. There's been a longstanding abuse of discretion standard up to the adoption of the Loan and Mortgage Foreclosure Law. And I think all the case law dealing with the Loan and Mortgage Foreclosure Law has stated that that changed the law and greatly reduced the court's discretion, namely as to, one, does the document, the loan agreement, allow for appointment of a receiver? And two, is there a reasonable likelihood of success, which is a proven default? And in Mellon Bank the court stated that a proven default and a reasonable likelihood of success usually would be involved by looking at the document, which would be a de novo type review. But then they go on to state, and I'm at page 868 of the Illinois Appellate opinion, our conclusion on this matter is even stronger in this case because the trial court in the previous quoted ruling made no, and they put it in italics, no findings of fact in denying Mellon's motion, which covers two things. First, in Mellon Bank the court was looking at review of the denial of appointment of a receiver. So it's different from this case in that respect. But second... In terms of standard review, why would it matter? Pardon me? In terms of, frankly, from the court review standpoint, why would it matter whether one is granted or not granted? Because if it's not granted, it comes basically before this court in the same form as it comes before the trial court. Namely, should there be a receiver? And with the limited discretion under the new provisions of the Illinois Mortgage Foreclosure Law, this court would also be making the same review of the documents. A de novo standard may be in order. However, I think if you go further, if there's findings of fact to be made, or judgmental considerations... Whether he appointed one or not, whether one was appointed or not, I'd suggest have nothing to do with our standard review. I would agree that if the trial court makes a findings of fact, then it should change our standard review. Or we viewed it as a judgmental consideration by the trial court, where the trial court uses its discretion to make a judgment determination, for example, as to a receiver's qualifications or some other such matter. So what's your position? It should be an abuse of discretion to the extent that there are some judgmental determinations made by the trial court. Otherwise, as this court has stated and Mellon Bank stated, it's de novo. I would note that Mellon Bank was decided in May 1993, and the asset guarantee case was also by the First District in September 1993, and that's why we cited it as support for abuse of discretion standard. The asset guarantee court does, of course, say it is an abuse of discretion standard, following what had then been a long history of Illinois law on receivers. I think a couple other points, Your Honor. I think I've covered the part about the default and the standard review, but some other comments were made, namely about the duress argument and the Herget case was cited. In Herget, there's a very important fact. In that case, the bank went to the individual who signed the notes and told the individual that he would be liable on the notes, even though they were signed by his wife. In other words, the bank took some affirmative action to create the duress. Here, the bank did not create the duress. The duress is a function of the borrower's own mismanagement of the project and the cost overruns and his financial predicament, and that's a key factor why the duress defense has no application here, in addition to what the court stated, namely financial circumstances in and of themselves are not duress. The other thing is on the leases. As I've explained, leases probably are some of the best evidence as to why a receiver was needed here because of this increasing pattern of self-dealing, the increasing financial obligations attributable to the leases. If the court has no further questions. Thank you so much. Thank you, Your Honor. Briefly, Mr. Reese. I know the court indulged me, so I'll keep my rebuttal brief. Go ahead. The point on the default I already made, which is the letter agreements refer to the loan agreement. The loan agreement requires a formal request. The formal request was never made. The point about where the bank now is trying to justify the receiver by these increasing loan imbalances, the bank is acting as if it had no idea what was going on. The verified, undenied facts in the record are that the borrowers repeatedly and regularly apprise the bank every step of the way, including having monthly meetings, including at the bank's request paying the John Buck Company $25,000 a month coming out of our client's pocket to consult and advise the bank about what was going on in this project, including giving the bank monthly pro formas. The bank, knowing full well what was going on, approved that work. At any time, the bank could have decided not to approve the work. The Latches defense, Your Honor, that I didn't really discuss in my opening remarks, is really right on point here. When a party sets on its rights and the other party changes its position in response, that's what Latches is. It's a fact-based defense. Here, the bank sat on its rights, no doubt about that. They got 23 letters of agreement. They could have said, you're in default, pay up in 90 days or close it down. They did, but they didn't. Or they could meet with your client and get letters of agreement. But the fact that they didn't is significant. Would you be in a different position if they had 10 letters of agreement? I don't know whether it's 1 or 10. The point is that at the time that they were signing the letters, the letters were subject to the letter agreement, which required the formal request. And so the reality here is all the letters do, really, is a practical matter. The parties acknowledge that there is a loan imbalance. But what's leaving out there is what's going to happen. At the time, they were negotiating a modification, so there was no need and it wouldn't be reasonable to expect that my client would go out in the face of that and get other financing. It was reasonable that they would continue to work with the bank on a loan modification. When finally, just before the bank filed the case, it became clear and the bank said, we're not doing any loan modification. At that point, what the bank should have done is it should have sent a letter saying, okay, now we're making the request. Under 11.k of the agreement, you have 90 days, and if we didn't satisfy the loan imbalance within 90 days, then they would be in a different situation. They would be able to sue, the default would be clear, and they would be able to get a receiver subject to other defenses of good cause, for example. So between the $26 million and the $42 million, somewhere in between there, your position is they should have come in and asked for their money. Or they could have. I'm not saying that they should have. In fact, I don't think they should have because here everybody knew what needed to be done to get the project done in compliance with the city redevelopment agreement. What about the fact that the amount owed just kept growing, kept going more and more? Well, it was growing to complete work that was required by the city under the city redevelopment agreement, again, really in partnership with the bank. And there are two ways to put the loan in balance. One is to make a payment. The other is to adjust the budget. And the parties didn't do that, but all along the way, again, for the bank now to come in and act like there really is nothing in the record that supports this assertion that this project was ballooning out of control. Instead, all of the costs that were approved were costs that were approved by the bank and that the bank agreed to fund. Also, Your Honor, along that line, there's absolutely nothing in the record other than the bank's own self-serving statement about this purported self-dealing. The bank certainly didn't allege it in the complaint, and in fact they insisted they didn't need to. This, again, is an effort after the fact to come back and to really cast some aspersions, but the reality is what they're calling their self-dealing are these I'm not trying to move a call. There was no allegation in the briefs about this. I wouldn't worry about that. There would be no need to address it. Briefly, Your Honor, with respect to Mr. Anderson's citations to the counterclaim, I don't know if he misspoke, but we're really not talking about the counterclaim. The bank did separately move to dismiss the counterclaim, so there again on those counts, the fact-based allegations at least are admitted as true. I don't know if he's even completed. We filed our response to that motion just yesterday, so that hasn't been ruled on on the counter. Well, I think what he's doing, honestly, Mr. Anderson, I was trying to explain to people who are rather unsophisticated, which unfortunately are the judges in this case, about what was really going on, and that's very important for us because I really don't know what's going on. Why are the parties doing what they're doing is very, very important in this court, but we don't know. I don't have any experience in that. The more important point I think that Mr. Anderson was trying to make was he was trying to tie the defenses to the discussions of the loan modification to try to get them barred by the Illinois credit agreements. Right. Probably in response to your point about you have to stick to the record and it's all about loan modification. And one reason that fails is because, again, the discussions of the loan modification predated the defenses that we're talking about. So those were happening long before. They're not inextricably linked as they were in the cases that he cites. Finally, Your Honor, just on the standard of review, I think both in Mellon Bank and in Centerpoint this court addressed the standard of review and it's de novo in this particular case. That's not to say that there couldn't be a foreclosure case or a receivership case where the court does have an evidentiary hearing, does make credibility findings, and it's perhaps in that case it could be appropriate to apply a deferential standard of review. But that didn't happen here. The court made its decision based on the record before her, based on the pleadings and the affidavits, which this court can do as well. Thank you so much. Both sides did a great brief, excellent briefs and excellent arguments. This matter will be taken under advisement.